# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

### CIVIL CASE NO. 3:07cv295
### [Criminal Case No. 3:02cr156-3]

| | | |
|---|---|---|
| **PAUL ZIMMERMAN, JR.,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF DECISION** |
| | ) | **AND ORDER** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Petitioner's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Motion Under 28 U.S.C. §2255) [Doc. 1] and the Government's Motion for Summary Judgment [Doc. 12].

## PROCEDURAL HISTORY

On September 13, 2002, the Petitioner and six co-defendants were charged in a 66 count superseding bill of indictment with participating in a wide ranging scheme to defraud investors in the secondary mortgage market. [Criminal Case No. 3:02cr156, at Doc. 45]. The indictment charged that the Petitioner conspired with his wife, Debbie Zimmerman, and five other co-defendants to defraud the Federal National Mortgage Association (Fannie

Mae) by selling to it bogus mortgage notes, to defraud the United States by pooling fictitious mortgage notes into securities to be issued by the Government National Mortgage Association (Ginnie Mae), and to launder the proceeds of their fraud, all in violation of 18 U.S.C. § 371 (Count 1) [Id., at 1-16]. Counts 2 through 10 charged the Petitioner with using interstate wire transmissions to sell false mortgage notes to Fannie Mae, aiding and abetting the same, in violation of 18 U.S.C. §§1343 and 2. [Id., at 16-17]. Counts 42 through 44, 47, 51 and 52 charged the Petitioner with making and passing false statements to HUD, aiding and abetting the same, in violation of 18 U.S.C. §§1010 and 2.

In November 2002, the Petitioner, his wife and two of his co-defendants, James and Macy McLean, went to trial. The Government's evidence established:

> James and Macy McLean were officers and owners of First Beneficial Mortgage Corp (FBMC), a mortgage company based in North Carolina. As a qualified Federal Housing Administration (FHA) lender with direct endorsement authority, FBMC had the authority to approve mortgage loans for federal FHA insurance. An FHA-insured mortgage loan, in turn, is "readily saleable" on the secondary mortgage market. FBMC was also an approved Fannie Mae lender, meaning FBMC could originate a mortgage loan with the borrower and then Fannie Mae would immediately buy the mortgage on the secondary market without doing its own underwriting evaluation.
>
> FBMC created a subsidiary company, First Beneficial Homes

(FBH), which was in the business of building modular homes financed by FBMC. [The Petitioner and his wife], both of whom were employed by FBMC, were officers in FBH, as was Macy McLean. In order to obtain funds for FBH to build homes, the McLeans, Zimmermans and a third couple . . . recruited individuals, primarily friends and relatives, to sign mortgage loan notes purporting to secure funds advanced by FBMC for homes that, in fact, did not exist or were owned by someone other than the "borrower" named on the note. The McLeans and Zimmermans induced these individuals to sign the mortgage notes by paying them various amounts to participate in an "investment" opportunity and representing that, by signing, the "investors" did not actually incur any repayment obligation. The McLeans and Zimmermans also signed similar fictitious mortgage notes themselves. None of the individuals signing these documents ever acquired or possessed any ownership interest in the properties listed on the notes.

FBMC would then sell these "instruments" to Fannie Mae on the secondary market, representing by the terms of the note that the borrowers signing the note had an ownership interest in the listed property, that FBMC had a security interest in the property, and that the property was of sufficient value to protect the lender – or any secondary purchaser of the loan such as Fannie Mae – in the event of default. As an approved Fannie Mae lender, FBMC ... [e]ssentially ... was empowered to make underwriting decisions on behalf of Fannie Mae.

Eventually, Fannie Mae detected irregularities in FBMC underwriting practices and conducted an audit of the loans it had purchased. A physical inspection of the properties for which FBMC had purportedly financed the purchase of a completed home revealed that [ ] many of the lots were either vacant or contained a partially completed house. Additionally, some of the lots that ostensibly secured mortgage loans already purchased by Fannie Mae were being offered for sale. James McLean claimed that he incorrectly assumed that Fannie Mae would purchase construction loans, which disburse funds in piecemeal fashion as each new phase of construction begins. Fannie Mae, however,

does not purchase construction loans, which FBMC was not authorized to sell. And, FBMC had not sold the loans as construction loans to Fannie Mae in any event. In November 1998, when FBMC could not account for all of the irregularities, Fannie Mae suspended FBMC as an approved lender.

Faced with the collapse of the Fannie Mae scheme, James McLean agreed to repurchase the loans FBMC sold to Fannie Mae. Although he told Fannie Mae that he had secured investors willing to fund the repurchase of these loans, he refused to divulge the identity of the investors. In fact, FBMC secured funds to repurchase the loans by simply continuing the Fannie Mae "investor" scheme with Ginnie Mae. Ginnie Mae, which is owned by HUD, sells mortgage-backed securities which are created from "pools" of mortgage loans. A qualified mortgage lender originates several FHA - insured mortgages, "pools" them together, and sells them – without any review – to Ginnie Mae. Ginnie Mae, in turn, sells an interest in the mortgage pool to investors. FBMC was qualified as a Ginnie Mae lender and issuer, meaning that not only did Ginnie Mae implicitly approve of any mortgage loan extended by FBMC, but FBMC could actually issue Ginnie Mae securities.

The McLeans and Zimmermans used the same lots and "investor scheme" with Ginnie Mae that they had used for Fannie Mae, and the overall process was essentially the same. James McLean paid a commission to the Zimmermans for each "investor" they recruited. The Zimmermans brought their investors to Macy McLean. Macy then gave her assistant these names, along with an address and a purported loan amount, which the assistant inserted into a mortgage note. Ginnie Mae would not accept mortgage loans that were not federally insured, so one of FBMC's loan officers was directed to "supply" an FHA number for the note. The mortgage notes were then signed by the "investors," and, as required by Ginnie Mae, delivered to FBMC's document custodian, BB & T Bank, for initial certification. [The McLeans] also had to file certain information electronically. FBMC then issued securities which were sold to Ginnie Mae investors. The purchase price was wired to FBMC's account at BB & T.

FBMC also obtained a line of credit at BB & T to fund loans to its customers. As collateral to secure the line of credit, FBMC supplied BB&T with fictitious mortgage notes signed by "investors" who had no ownership interest in the property purportedly secured by the note. Although the line of credit was to be used by FBMC strictly for funding mortgage loans to FBMC clients, FBMC used line of credit money to pay down the fictitious loans sold to Ginnie Mae as well as to repurchase loans from Fannie Mae.

[O]nly seven percent of the proceeds from the sale of fictitious notes to Ginnie Mae went to fund legitimate expenses such as construction and land for FBH's business. One million dollars was allocated to the growing monthly payments on the increasing number of false mortgage notes, and approximately $340,000 was paid out to the Zimmermans and [the third couple] for commissions. The Zimmermans used structured transactions to deposit half of this into their personal accounts. And $7.5 million of the Ginnie Mae funds were simply transferred to Fannie Mae to repurchase the false notes.

United States v. McLean, 131 Fed.Appx. 34, 36-38 (4th Cir. 2005) (emphasis in original).

On November 22, 2002, the jury returned a special verdict, convicting the Petitioner of Count 1, conspiracy to defraud the United States in violation of 18 U.S.C. §371, and of Counts 47, 51 and 52, making false statements in violation of 18 U.S.C. §§1010 and 2. [Criminal Case No. 3:02cr153-3, at Doc. 147]. On December 22, 2003, the Petitioner was sentenced to 132 months imprisonment. [Id., at Doc. 222].

On appeal, the Petitioner argued the trial court committed error by giving the jury a willful blindness instruction, refusing to give a good faith instruction

in connection with the charges that he passed false mortgage notes, and refusing to charge the jury that the Petitioner's reliance on the expertise of James McLean was a defense to the charges. McLean, 131 Fed.Appx. at 38-40 n.1. In addition to errors assigned to the Court, the Petitioner argued that the evidence was insufficient to support his convictions. Id., at 41. Finally, the Petitioner challenged his sentence pursuant to United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Id.

The Court of Appeals rejected the Petitioner's argument that the willful blindness instruction was improper, noting that there was evidence to permit the jury to find actual knowledge and to conclude that "if [the Petitioner was] not specifically aware that [he was] defrauding the government, [he was] willfully blind to that fact." McLean, 131 Fed.Appx. at 39.

> Evidence of [the Petitioner's] actual knowledge of the scheme to defraud the government included [the Petitioner's] testimony that he and his wife heard James McLean say that FBMC was "HUD-supported" and that he understood the mortgage notes that they were having executed bore an FHA number and other FHA markings. It also included the testimony of Eric Brown, who explored the possibility of financing a family-owned real estate venture through FBMC in the early part of 2000. Upon arriving at FBMC for what Brown believed was a preliminary meeting, [the Petitioner's wife] presented [Brown] with mortgage documents bearing his name and the names of his parents as the purported debtors. ... When Brown balked at signing and asked if his attorney could review the documents, James McLean explained ... that the scheme was "legal, but ... not really legal." [The Petitioner] explained to Brown that if [Brown's parents] signed,

they would have no obligation under the notes, and that FBMC
was obtaining its financing through some federal agency.

Id., at 39.

The Circuit concluded that the trial court did not abuse its discretion in

refusing to give a good faith instruction for the false statements charges. Id.,

at 40. The Circuit also affirmed the trial court's refusal to instruct the jury that

the Petitioner's reliance upon McLean's expertise was a defense. Id. The

Circuit held "there was ample evidence for a reasonable trier of fact to have

found [the Petitioner] guilty beyond a reasonable doubt on each count of

conviction." Id., at 41.

The Circuit held that the sentencing court properly applied the guidelines

and committed no error. Id. However, based on the Booker decision, which

applied to a case on direct appeal, the Court of Appeals vacated the

Petitioner's sentence and remanded for reconsideration of the Guidelines as

an advisory range of sentencing along with the relevant factors of 18 U.S.C.

§ 3553(a). Id.

On July 27, 2005, the trial Court conducted a re-sentencing hearing for

the Petitioner. Applying the Guidelines pursuant to Booker, 543 U.S. 220,

and considering the §3553(a) factors, the Court again sentenced Petitioner to

132 months imprisonment. [Criminal Case No. 3:02cr156, Doc. 326]. The

Petitioner appealed again on the ground that this sentence was unreasonable. On July 31, 2006, the Fourth Circuit affirmed, finding the sentence was both procedurally and substantively reasonable. United States v. McLean, 192 Fed.Appx. 234, 236 (4th Cir. 2006), *certiorari denied* Zimmerman v. United States, 551 U.S. 1166, 127 S.Ct. 3052, 168 L.Ed.2d 765 (2007). On July 26, 2007, the Petitioner timely filed this motion pursuant §2255. He asserted thirteen claims for relief which may be classified as follows: (1) claims of defects in the indictment; (2) claims of insufficient evidence; (3) claims of prosecutorial misconduct; and (4) claims of ineffective assistance of counsel. Petitioner casts all of these in the posture of ineffective assistance claims. In the other postures that Petitioner asserts, these claims are procedurally barred or defaulted, some because they have been rejected by the Fourth Circuit on direct appeal,[1] and others because Petitioner could have raised them on direct appeal but did not.[2] For this reason all of

---

[1]On direct appeal, the Petitioner argued that the evidence was insufficient to show that he understood how the mortgage transactions worked or that the documents were being submitted to governmental bodies; that is, that he acted knowingly and intentionally. McLean, 131 Fed.Appx. at 39-40. He has reiterated that argument in this motion. [Doc. 1-1, at Grounds 7, 8, 9, 11]. Because these claims were raised and rejected on appeal, and because there has not been any intervening change in the law, the Petitioner is procedurally barred from raising them again. McLean v. United States, 2011 WL 148313 (W.D.N.C. 2011) (citations omitted).

[2]In this motion, the Petitioner argues that Counts 47, 51 and 52 were constructively amended (Grounds 1, 3, 4, 10), duplicitous (Ground 2) and multiplicitous (Grounds 5, 6). He also argues that the entire indictment was constructively amended because of the trial Court's aiding and abetting instruction (Ground 1), knowingly and

Petitioner's claims are addressed herein as ineffective assistance of counsel

claims.

## STANDARD OF REVIEW

At the time the Government's motion for summary judgment was filed,

Rule 56 of the Federal Rules of Civil Procedure read, in pertinent part, as

follows:

> When a motion for summary judgment is properly
> made and supported, an opposing party may not rely
> merely on allegations or denials in its own pleading;
> rather, its response must – by affidavits or as
> otherwise provided in this rule – set out specific facts
> showing a genuine issue for trial.  If the opposing
> party does not so respond, summary judgment
> should, if appropriate, be entered against that party.

Fed.R.Civ.P. 56(e)(2) (2009).

> Under the Federal Rules of Civil Procedure, summary judgment
> shall be awarded "if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits,
> ... show there is no genuine issue as to any material fact and that
> the moving party is entitled to a judgment as a matter of law."
> Fed.R.Civ.P. 56(c).  As the Supreme Court has observed, "this
> standard provides that the mere existence of *some* alleged factual

---

intentionally instruction (Ground 3), and willful blindness instruction (Ground 4).  Finally, he claims prosecutorial misconduct (Ground 12).  Claims that could have been but were not raised on direct review are defaulted.  United States v. Pettiford, 612 F.3d 270, 280 (4th Cir. 2010), *certiorari denied* 131 S.Ct. 620, 178 L.Ed.2d 454, 79 U.S.L.W. 3300 (2010).  Although the Petitioner argues these claims were not raised due to ineffective assistance of counsel, that conclusory assertion is insufficient to establish cause for that failure.  McLean v. United States, 2011 WL 148313 (W.D.N.C. 2011) (citations omitted).

dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."

Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003), *certiorari denied* 541 U.S. 1042, 124 S.Ct. 2171, 158 L.Ed.2d 732 (2004) (emphasis in original).

A party opposing a properly supported motion for summary judgment

"may not rest upon the mere allegations or denial of [his] pleadings," but rather must "set forth specific facts showing that there is a genuine issue[.]" Furthermore, neither "[u]nsupported speculation," nor evidence that is "merely colorable" or "not significantly probative," will suffice to defeat a motion for summary judgment; rather, if the adverse party fails to bring forth facts showing that "reasonable minds could differ" on a material point, then, regardless of "[a]ny proof or evidentiary requirements imposed by the substantive law," "summary judgment, if appropriate, shall be entered."

Id.

## DISCUSSION

The Supreme Court has stated the test for determining whether a defendant received adequate assistance of counsel.

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Unless a defendant makes both showings, his claim of ineffective assistance of counsel must fail.  Id.  Thus, a defendant must show counsel's performance fell below objective standards of reasonableness, and, that but for his conduct, there was a reasonable probability the result of the trial would have been different.  Id., at 688.

In reviewing claims of ineffective assistance of counsel, "[j]udicial scrutiny of counsel's performance must be highly deferential."  Id. at 689. Indeed, the Court must make "every effort . . . to eliminate the distorting effects of hindsight," operating, instead with "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.  A petitioner bears the burden of proving Strickland prejudice and if he fails to do so "a reviewing court need not consider the performance prong." Fields v. Attorney Gen. of State of Md., 956 F.2d 1290, 1297 (4th Cir. 1992), certiorari denied 506 U.S. 885, 113 S.Ct. 243, 121 L.Ed.2d 176 (1992).

Moreover, the right to effective assistance of counsel extends to the direct appeal phase of the case.  Evitts v. Lucey, 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) ("A first appeal as of right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective

assistance of an attorney."). Nevertheless, counsel's "decision with respect to an appeal is entitled to the same presumption that protects sound trial strategy." Pruett v. Thompson, 996 F.2d 1560, 1568 (4th Cir. 1993), *certiorari denied* 510 U.S., 114 S.Ct. 487, 126 L.Ed.2d 437 (1993).

## Constructive amendment of the indictment.

The Petitioner claims that counsel was ineffective for failing to object at trial and on appeal to what he perceives as constructive amendments to the superseding bill of indictment. The Government responds that the Petitioner's arguments reflect his misunderstanding of the law.

"'When the government, through its presentation of evidence or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment – sometimes referred to as a fatal variance – occurs.'" United States v. Ashley, 606 F.3d 135, 141 (4th Cir. 2010), *certiorari denied* 131 S.Ct. 428, 178 L.Ed.2d 333, 79 U.S.L.W. 3245 (2010), *quoting* United States v. Malloy, 568 F.3d 166, 178 (4th Cir. 2009), *certiorari denied* 130 S.Ct. 1736, 176 L.Ed.2d 212, 78 U.S.L.W. 3518 (2010). Indeed, a constructive amendment is a fatal variance "because the indictment is altered 'to change the elements of the offense charged, such that the defendant is

actually convicted of a crime other than that charged in the indictment.'" United States v. Randall, 171 F.3d 195, 203 (4th Cir. 1999), *quoting* United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). However, not all differences between an indictment and proof at trial rise to the level of a "fatal variance" or constructive amendment. Id., at 203. Indeed, when different evidence is presented at trial than specified in the indictment, but such evidence does not otherwise alter the crime charged in the indictment, a mere variance occurs. Id. A mere variance does not violate a defendant's constitutional rights unless it prejudices the defendant, either by hindering the preparation of his defense, surprising him at trial, or exposing him to the risk of a second prosecution for the same offense. Id.

The Petitioner contends that the Court amended Counts 47, 51 and 52 which charged that he made and passed false mortgage notes in violation of 18 U.S.C. §§1010 & 2. The Court, he argues, instructed the jury on aiding and abetting which broadened the indictment because aiding and abetting did not appear in these counts. Petitioner, therefore, concludes that because his trial attorney did not object to that instruction, counsel provided ineffective assistance.

Counts 47, 51 and 52 of the superseding indictment, however, include citations to 18 U.S.C. §2, the aiding and abetting statute. [Criminal Case No.

3:02cr156, Doc. 45, at 21, 23]. Moreover, the Fourth Circuit has long held that the theory of aiding and abetting is implied in every federal indictment of a substantive offense. Ashley, 606 F.3d at 143; United States v. Duke, 409 F.2d 669 (4th Cir. 1969), *certiorari denied* 397 U.S. 1062, 90 S.Ct. 1497, 25 L.Ed.2d 683 (1970) ("we have consistently held that under 18 U.S.C.A. § 2 one may be convicted of aiding and abetting under an indictment which charges only the principal offense"). Since there was no reason for trial counsel to object to this instruction, the Petitioner cannot show ineffective assistance either at the trial or appellate level.

The Petitioner also argues that the indictment was broadened by the Court's definitions in the jury instructions of "knowingly," "intentionally," and "willful blindness" because those words were not contained in the indictment. The Petitioner claims the instructions changed the elements of the offense charged without the elements appearing in the indictment.

The language contained in each of the counts tracked the language of the statute, 18 U.S.C. §1010, and contained the required elements of knowledge. Each count alleged that the Petitioner made and passed counterfeit mortgage notes "knowing that they were materially false." [Criminal Case No. 3:02cr156, Doc. 45, at 21]. Because this language was contained within the indictment, the Court defined for the jury the words

"knowing," "intentional," and "material;" definitions which did not broaden the indictment but which explained the charge, including the *mens rea* and *scienter* elements thereof. McLean, 2011 WL 148313 **15-16; United States v. Wills, 346 F.3d 476, 494 (4th Cir. 2003), *certiorari denied* 542 U.S. 939, 124 S.Ct. 2906, 159 L.Ed.2d 816 (2004) (instruction which accurately tracks valid language from applicable statute is not susceptible to attack).

The law also does not require that the words "willful blindness" appear in the charged offenses before the Court may instruct on how that legal theory might apply to the facts of this case. Rather, such an instruction is proper when, as the Fourth Circuit found in this case, 'the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." McLean, 131 Fed.Appx. at 38-39. Indeed, the Fourth Circuit affirmed the use by the trial court of a willful blindness instruction in this case. Id. Therefore neither trial nor appellate counsel could have been ineffective for failing to raise these issues.

The Petitioner also contends that the Government constructively amended the superseding bill of indictment by presenting evidence to the jury which deviated from the specific allegations in the charged offense. The Petitioner contends the Government constructively amended the indictment by introducing evidence that he passed counterfeit notes to HUD. The

superseding indictment charged a broad scheme to defraud Fannie Mae, Ginnie Mae and Branch Banking & Trust Co. (BB&T) as well as investors in the secondary mortgage market.  [Criminal Case No. 3:02cr156, Doc. 45, at 6-9].  In Counts 47, 51 and 52, the indictment charged that the Petitioner and others made and passed false statements and counterfeit notes knowing they would be insured by HUD.  [Id., at 21-23].  The introductory paragraphs of the indictment as well as Count One are incorporated into Counts 47, 51 and 52 by reference.  [Id., at 21].  Paragraphs 16 and 23 through 34 of Count One specifically allege that the conspirators made and sold false mortgage notes to Ginnie Mae, a corporation that is wholly owned by the United States and administered by HUD. [Id. at 8, 11-13].  The Government's evidence did not introduce a new theory with respect to any element of the charged offense.  Instead, its evidence tracked the indictment and proved the Petitioner's guilt on the charged offenses beyond a reasonable doubt.  United States v. Ward, 486 F.3d 1212, 1228 (11th Cir. 2007), *certiorari denied* 552 U.S. 960, 128 S.Ct. 398, 169 L.Ed.2d 280 (2007) (indictment alleging mail fraud and wire fraud was not constructively amended by incorporation of a charged conspiracy by reference).  Consequently, neither trial nor appellate counsel was ineffective for failing to challenge the evidence at trial or to raise this issue on appeal.

The Petitioner also contends that the indictment was constructively amended when the Court permitted the introduction of evidence about Ginnie Mae's losses despite the fact that loss is not an element of 18 U.S.C. §1010. The Government, however, did not introduce evidence of how much money Ginnie Mae lost due to the fraud committed in this case. Instead, the Government offered evidence of how much money Ginnie Mae reimbursed the loan servicer who took over FBMC's loans. The trial testimony concerned loans for which the servicer could not collect past due payments or find collateral on which to foreclose. [Criminal Case No. 3:02cr156, Trial Tr. Vol. IV, at 1084-94]. Specifically, the servicer's representative testified that it could not collect on most FBMC loans because it could not locate many of the borrowers named on the loans issued by FBMC and found "bad addresses" when they tried to foreclose on the collateral listed on FBMC loan documents. [Id., Trial Tr. Vol. IV, at 1091-93]. The representative's testimony that Ginnie Mae paid out over $23 million by the time of trial was introduced to show the fraudulent conduct involved in the conspiracy and false statement counts. It also established that a governmental agency, HUD, had been impacted by the fraudulent loans. Furthermore, this evidence rebutted the Petitioner's claim that he did not knowingly commit fraud.

The Government's evidence did not improperly broaden the offenses

charged in the indictment.  Consequently, neither trial nor appellate counsel was ineffective in failing to challenge the evidence at trial or to raise the issue on appeal.

**Defective superseding bill of indictment.**

In addition to claiming that the indictment was constructively amended, the Petitioner also claims that Counts 47, 51 and 52 were defective because they failed to include the words "aiding and abetting" and "knowingly and intentionally" within the body of the count.  The gist of Petitioner's argument appears to be that these words are required to have been included in the indictment because the Court used them in its charge to the jury.  Since defense counsel did not raise this issue at trial or on appeal, the Petitioner claims counsel was ineffective.

In order to be sufficient, an indictment must contain the elements of the offense and fairly inform the defendant of the exact charge against him so that he could plead double jeopardy in bar of future prosecutions for the same offense.  Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974).  Thus, where the indictment sets forth the offense in the words of the statute itself, it is sufficient so long as those words are unambiguous and set forth the elements of the offense charged. Id.

In this case, each of the counts which the Petitioner challenges tracks the language of the statute. Counts 47, 51 and 52 allege that the Petitioner and his co-defendants made and passed counterfeit mortgage notes "knowing that they were materially false" and "knowing them to have been counterfeited." [Criminal Case No. 3:02cr156, Doc. 45, at 21]. The word "knowing" as used in the indictment charges the element of *scienter*; that is, that the Petitioner's actions were done knowingly. Staples v. United States, 511 U.S. 600, 607, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (mental element required to be convicted of a crime); United States v. Pupo, 841 F.2d 1235, 1238-39 (4th Cir. 1988), *certiorari denied* 488 U.S. 842, 109 S.Ct. 113, 102 L.Ed.2d 87 (1988) (where knowledge is an element of the crime, the indictment may include the word "knowingly" or it may be averred generally in "words of similar import") (citation omitted); United States v. Ellis, 50 F.3d 419, 426 (7th Cir. 1995), *certiorari denied* 516 U.S. 849, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995) (elements of making false statements to HUD are (1) making false statement in application; (2) knowing statement was false; and (3) done to obtain a loan from HUD).

Simply because the Court instructed the jury on the definition of intentionally does not mean that the indictment should have contained that word. "An indictment is sufficient if it states each of the essential elements of

the offense." United States v. Lockhart, 382 F.3d 447, 449 (4th Cir. 2004), *certiorari denied* 543 U.S. 1079, 125 S.Ct. 940, 160 L.Ed.2d 823 (2005) (citation omitted). While the Court's instructions may have included an additional word to explain the required knowledge to the jury, that fact does not render the indictment defective. The indictment is constitutionally sufficient because it put the Petitioner on notice of the offense with which he was charged and is sufficient to bar any future prosecutions for the same crimes. United States v.Smith, 441 F.3d 254, 260-61 (4th Cir. 2006), *certiorari denied* 549 U.S. 903, 127 S.Ct. 226, 166 L.Ed.2d 180 (2006).

The Petitioner also argues that these counts were defective because the words "aided and abetted" were not included in the body, even though the statutory citation to 18 U.S.C. § 2 was so included. As previously noted, the theory of aiding and abetting is implied in every indictment charging a substantive offense. Duke, 409 F.2d at 671. Moreover, here each count in the indictment contained a reference to the statute charged in its caption and in the body of the charge itself.

The Petitioner has not shown that either trial or appellate counsel rendered ineffective assistance.

**Multiplicitous counts of the superseding indictment.**

The Petitioner next claims that counsel was ineffective for failing to object to Counts 51 and 52 as multiplicitous. The counterfeit mortgage notes to which these separate charges relate, he argues, were sold to Ginnie Mae investors within the same pool.

Multiplicity occurs when a single offense is charged in more than one count in an indictment. United States v. Goodine, 400 F.3d 202, 207 (4th Cir. 2005) (citation omitted). The primary danger of a multiplicitous indictment is that a defendant "may be given multiple sentences for the same offense." United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993), *certiorari denied* 508 U.S. 967, 113 S.Ct. 2949, 124 L.Ed.2d 696 (1993).

Counts 51 and 52 charged that Petitioner and his co-defendants made, passed and uttered different counterfeit mortgage notes. The Petitioner claims that because the mortgage notes identified in Counts 51 and 52 were sent together in one pool, submitted on the same day in a single data file, and shipped as a single loan package, he should have been charged with only one count of violating 18 U.S.C. §1010 instead of two.

Section1010, however, punishes "whoever ... makes, passes [or] utters ... *any* statement, knowing the same to be false ... or counterfeits *any* instrument ... or utters, publishes, or passes as true *any* instrument, paper, or

documents, knowing *it* to have been ... counterfeited." (emphasis provided).

At trial, the Government established that the Petitioner and his wife submitted the names of "investors" to Macy McLean and, in turn, Mrs. McLean directed her assistant to type the fraudulent notes from lists of properties that she and the Zimmermans provided. [Criminal Case No. 3:02cr156, Trial Tr. Vol. II, at 497]. The notes were counterfeit because the names on the loans were not the names of true borrowers and the properties listed were not residences that would be occupied by the named borrowers. The counterfeit notes were then returned to the Zimmermans, who brought them to the persons named as borrowers for their signatures. The Petitioner "passed" the notes by bringing them to Macy McLean after the false borrowers signed them. Mrs. McLean further passed the notes by forwarding them to the document custodian at BB&T. The note underlying Count 51 purported to pertain to property located at 3310 North Rocky River Road in Monroe, North Carolina, and was signed by a person known to the grand jury as K.D. in the amount of $135,000. [Doc. 11-15]. The note underlying Count 52 purported to pertain to for property located at 3200 Polk and White Road in Monroe, North Carolina, and was signed by a person known to the grand jury as C.M. in the amount of $134,000. [Doc. 11-16].

The indictment and evidence at trial showed that Counts 51 and 52

arose from two separate counterfeit mortgages, with two different fictitious borrowers' names and signatures, two different addresses, and involved two different amounts. The fact that these two mortgages were made on the same day or placed in the same Ginnie Mae pool means only that with respect to these counterfeit notes, the Zimmermans and McLeans committed two crimes on the same day. Counts 51 and 52 describe different promissory notes that were "made, passed [or] uttered" as to different properties. As such, the conduct constitutes two separate violations of law. Indeed, the language in §1010 reflects Congress' intent that the making of each false or counterfeit instrument would constitute a separate violation of the law. Bins v. United States, 331 F.2d 390, 392 (5th Cir. 1964), *certiorari denied* 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964) ("The essence of a violation of [§1010] is the uttering and publishing of false documents with intent to influence [HUD]."); United States v. Butler, 704 F. Supp. 1338, 1343 (E.D. Va. 1989), *affirmed* 905 F.2d 1532 (4th Cir. 1990), *certiorari denied* 498 U.S. 900, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990) (noting that each separate use of wire communications constitutes a separate offense even if defendant was engaged in a single scheme to defraud) (citation omitted). Thus, the charges are not multiplicitous.

The Petitioner also claims that counsel should have challenged these

counts at sentencing on the ground of multiplicity.  Although not clear, the Petitioner may believe the Court should have merged the two convictions and imposed one sentence.  For the reasons articulated in the preceding paragraphs, however, there is no legal or factual basis to support the Petitioner's claim that these counts are multiplicitous or that the consecutive sentences imposed violated the double jeopardy clause of the Constitution.  Therefore, the Petitioner's claim that counsel was ineffective for failing to raise these arguments at trial and on appeal must fail.


**Duplicitous counts of the superseding bill of indictment.**

The Petitioner next contends that Counts 47, 51 and 52 of the indictment were duplicitous and counsel should have raised this objection at trial and on appeal.  Duplicity is the joining together of two or more distinct and separate offenses in a single count.  United States v. Hawkes, 753 F.2d 355, 357 (4th Cir. 1985); United States v. Toliver,  972 F.Supp. 1030, 1039 (W.D. Va. 1997).  Where a statute provides more than one means of committing the same offense, the policy against duplicity does not prohibit the Government from charging more than one of those means in the conjunctive, in one count.  United States v. Brandon, 298 F.3d 307, 314 (4th Cir. 2002) (citations omitted); Fed.R.Crim.P. 7(c) (a single count may allege that a defendant committed an

offense by one or more specified means). Further, the rule against duplicity does not prevent an indictment from alleging more than one act in a single count if the acts are part of a continuous course of conduct. <u>United States v. Smith</u>, 373 F.3d 561, 563-64 (4th Cir. 2004), *certiorari denied* 543 U.S. 1123, 125 S.Ct. 1048, 160 L.Ed.2d 1073 (2005).

Counts 47, 51 and 52 allege the making and passing of false statements and counterfeit mortgage notes to HUD in violation of 18 U.S.C. §1010. The Petitioner contends that the indictment was duplicitous because each of these counts charged the Petitioner both with making and passing false statements and counterfeit notes with the intent that false mortgage notes be accepted by HUD for insurance-backing and with making and passing false statements and counterfeit notes with the intent to influence the actions of HUD with respect to Ginnie Mae's guarantee of mortgage notes placed in mortgage-backed securities pools. In other words, because the indictment, according to the Petitioner, alleged two different *purposes* behind the making and passing of false statements and counterfeit notes, each of Counts 47, 51 and 52 is duplicitous because each alleges two different violations of the same statute.

Section 1010 is comprised of multiple clauses in the disjunctive. <u>United States v. Jenkins</u>, 785 F.2d 1387, 1391 (9th Cir. 1986). Prosecutors are

required to charge in the conjunctive in such cases.   United States v. Montgomery, 262 F.3d 233, 242 (4th Cir. 2001), *certiorari denied* 534 U.S. 1034, 122 S.Ct. 576, 151 L.Ed.2d 448 (2001) (citations omitted).   The essence of a violation of §1010 is the knowing use of false documents for the purpose of influencing HUD.   United States v. Berenstein, 533 F.2d 775, 787 (2nd Cir. 1976), *certiorari denied* 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976).   Because the statute is in the disjunctive, an allegation of more than one purpose for influencing HUD does not render the indictment duplicitous.   Tripp v. United States, 381 F.2d 320, 321 (9th Cir. 1967).   There is no legal or factual basis to support the Petitioner's claim that these counts were duplicitous.   As a result, counsel was not ineffective at either the trial or appellate level.

**Sufficiency of the evidence at trial.**

The Petitioner contends that the evidence against him was insufficient to prove that he acted with the requisite intent or willful blindness.[3]   Thus, he claims that counsel was ineffective for failing to raise this issue.   The record

---

[3]He claims the Government's evidence failed to show (1) that he acted knowingly, intentionally and willfully; (2) that the false items were material; (3) that he deliberately joined the conspiracy; (4) that he associated himself with the conspiracy; and (5) that he aided and abetted any such conduct.

reflects that at the close of the government's evidence and again, at the close of all evidence, counsel moved to dismiss and for a judgment of acquittal on the ground that the Government had presented insufficient evidence. On appeal, counsel argued that the sentencing Court erred because: (1) the Government failed to present a *prima facie* case in that it did not provide sufficient proof of the Petitioner's intent; (2) the Government failed to present evidence sufficient to refute the Petitioner's "good faith" defense beyond a reasonable doubt; and (3) the Government failed to provide evidence of the Petitioner's willful blindness or deliberate ignorance. [Brief of Appellants, at 32, McLean, 131 Fed.Appx. at 41. (No. 03-4899, 03-4922, 03-4923, 04-4038) 2004 WL 5245322]. Despite counsel's best efforts, these arguments were denied both at the trial and appellant level. The Fourth Circuit rejected these arguments, concluding that "there was ample evidence for a reasonable trier of fact to have found [the Petitioner] guilty beyond a reasonable doubt on each count of conviction." Id. The Court , therefore, must reject this claim as well.

**Ineffective trial and appellate strategies.**

The Petitioner claims that trial counsel should have called Mike Garcia, a Ginnie Mae account executive, as a witness at trial. According to the Petitioner, Garcia would have testified that during an interview with the

Federal Bureau of Investigation (FBI), he told the FBI agent and Ingrid Ripley, a Ginnie Mae employee, that loans on manufactured housing units could be placed in pools with single-family mortgage loans under certain limited circumstances. Although Garcia was not called by the defense, Ripley gave substantially similar testimony for the Government, indicating that she had relayed Garcia's understanding to the Petitioner's co-conspirator and employer, James McLean. Nevertheless, when McLean testified, his testimony showed that of the 186 loans which were placed in the Ginnie Mae pools by 2000, only two of them conceivably could have satisfied the pooling limitations.

"A decision consistent with a reasonable trial strategy cannot support a claim of ineffective assistance of counsel." Strickland, 466 U.S. at 689. Garcia's testimony would have added little to the Petitioner's defense since Ms. Ripley related the nature of that testimony during the Government's case. The decision not to call Garcia was a tactical one since he could have harmed the Petitioner by helping the Government establish that the loans in question were not qualified to be pooled. Counsel therefore was not ineffective in failing to call Garcia.

The Petitioner argues that counsel should have called Keith Jeffries to discredit the testimony of Richiedean Gess (Gess), a former employee of

FBMC, that the pooling practices were unlawful. The Petitioner believes that Jeffries would have testified that Gess told him the pooling practices were proper and consistent with Ginnie Mae manuals. James McLean, however, testified that he believed the pooling practices were lawful based upon information he acquired during a consultation with Gess. Jeffries' testimony would have been cumulative.

In addition, Jeffries' testimony would have been irrelevant in large part because the Petitioner's defense was that he relied innocently and exclusively on James McLean's expertise in the mortgage industry. The issue of whether Gess caused McLean to believe that the pooling practices were lawful was not relevant to the issue of whether the Petitioner relied on McLean in "good faith." Thus, the Petitioner was not harmed by his attorney's strategic decision not to call Jeffries as a witness.

Sandra Dixon (Dixon), a Ginnie Mae employee, testified that two annual re-certification forms submitted by James McLean were not legitimate Ginnie Mae documents. The Petitioner claims that he thought they were, relied on them and that showed his good faith belief in the legality of the pooling practices. He, therefore, argues that counsel should have attempted to impeach Dixon's testimony. As the Government accurately noted, however, the forms in question gave no indication that McLean was seeking permission

to become a Ginnie Mae issuer for mobile and manufactured housing. The omission of any reference to mobile and manufactured housing in the forms thus made them damaging to the Petitioner. Thus, counsel was not ineffective for failing to further highlight that damage.

Trial counsel did not introduce FBMC's application for Title I approval and the approval letters. The Petitioner claims this evidence would have shown that FBMC was approved to be a manufactured home lender and thus, he had a good faith belief that the pooling practices were lawful. However, both James McLean and Dixon testified that the application could not be located. The Petitioner does not dispute this testimony and he does not state that his attorney, in fact, had the application available to offer into evidence. The Petitioner cannot establish that his attorney was deficient for failing to introduce a document which could not be found.

Moreover, in this motion the Petitioner has admitted that Theodore Foster testified that FBMC was conditionally approved as a single family lender under the Ginnie Mae I program and as a participant in the Ginnie Mae II single family mortgage-backed securities program. [Doc. 1-1, at 7-8]. In the absence of an explanation by the Petitioner how the actual documents would

have better served him, he cannot establish prejudice.[4]

The Petitioner claims that his attorney should have impeached Eric Brown on the following issues: (1) whether the Petitioner's wife approached Brown about securing financing from FBMC for the development of a tract of land; (2) whether she misled Brown into attending a meeting with her and James McLean in order to get his signature on false documents; and (3) whether Brown was presented with mortgage notes that had been prepared in the names of people whom Brown did not know. Brown's testimony related to the Petitioner's wife and James McLean. The Petitioner has not shown in what manner this testimony prejudiced him and thus, he has not shown that counsel performed ineffectively.

The Government argued at trial that Brown's testimony was that McLean "explicitly" told him the investor program was "not really legal." The Petitioner claims that on appeal, counsel should have refuted that characterization because Brown's actual testimony was that McLean said "Look, this is – This is legal, but it's not really legal." The Court of Appeals, however, noted

---

[4]This argument overlooks the fact that FBMC's purported conditional authorization to issue mortgage loans for Ginnie Mae is an issue distinct from its authorization to engage in the pooling practices. The evidence at trial showed that the loans which were pooled by Petitioner and his co-defendants were made to straw borrowers under circumstances which were not in compliance with the Ginnie Mae-approved practices.

Brown's testimony, holding that McLean described the scheme as "legal, but . . . not really legal." McLean, 131 Fed.Appx. at 39. Since the appellate court was aware of the actual testimony, there was no prejudice.

Next, the Petitioner claims that counsel should have moved to suppress the testimony of Brown and Woodrow Moore as unduly prejudicial. The Petitioner has not shown that this evidence was obtained in violation of his Fourth Amendment rights. He therefore has not shown that defense counsel had grounds upon which to seek the suppression.

Brown and Moore testified about transactions involving Mooreland Estates which occurred during the life of the conspiracy charged in Count 1. The Petitioner claims the evidence should not have been admitted and counsel should have objected. Although those transactions were not charged in the indictment, the evidence was admissible to show the existence of the conspiratorial agreement and additional overt acts committed in furtherance thereof. United States v. Janati, 374 F.3d 263, 270 (4th Cir. 2004) (ruling on interlocutory appeal; finding that government should be permitted to prove facts outside the overt acts alleged in the indictment).

The Court rejects the Petitioner's arguments that the strategies of counsel at trial and on appeal constituted ineffective assistance.

**Failure to assert prosecutorial misconduct.**

The Petitioner's next accusation of ineffective assistance of counsel relates to counsel's failure to claim prosecutorial misconduct. The prosecutor, he argues, suborned perjury by presenting the testimony of James Beatty (Beatty), Sharon Abrams (Abrams), Gess, Dixon and Brown. He also asserts that the prosecutor also committed Brady[5] violations by failing to produce the application and approval letter(s) related to FBMC's authorization to issue Title I manufactured home loan guarantees. Lastly, he claims that the prosecutor included an inaccurate or misleading quote in his appellate brief.

In order to succeed on a claim of prosecutorial misconduct based on perjured trial testimony, a petitioner must first show that the testimony was, in fact, perjured, and second, that the Government knowingly used the perjured testimony in order to secure the conviction. Boyd v. French, 147 F.3d 319, 329-30 (4th Cir. 1998), *certiorari denied* 525 U.S. 1150, 119 S.Ct. 1050, 143 L.Ed.2d 56 (1999), *citing* Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). "The knowing use of perjured testimony constitutes a due process violation when there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." Boyd, 147 F.3d at 330 (internal citation and quotation omitted). However, "[m]ere

---

[5]Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

inconsistencies in the testimony by government witnesses do not establish the government's knowing use of false testimony."   United States v. Griley, 814 F.2d 967, 970-71 (4th Cir. 1987).

The Petitioner alleges that Beatty perjured himself before the grand jury by testifying that he had made mortgage payments on an FBMC home loan when other witnesses had told the FBI that Beatty had not made any payments.  Similarly, the Petitioner alleges that Abrams perjured herself by testifying that she did not have access to Fannie Mae and Ginnie Mae manuals when another witness testified that she had on-line access to those manuals.  All the Petitioner has shown is that inconsistencies existed between the testimony of various witnesses, which falls far short of showing that the Government knowingly suborned perjury.   Griley, 814 F.2d at 970-71. Furthermore, whether Beatty made mortgage payments on his own loan and whether Abrams had access to government manuals were facts immaterial to whether the Petitioner conspired to defraud the Government.

Similarly, the allegedly perjurious testimony of Gess, the former FBMC employee, who stated that she was not consulted on underwriting or asked to underwrite construction loans was contradicted by the testimony of other witnesses.  James McLean, for example, testified that he had consulted Gess about FBMC's "investor program" initially but not when they were pooled as

Ginnie Mae certificates. The fact that various witnesses testified inconsistently with each other, however, is insufficient to show that the prosecutor suborned perjury. Id.

As for Dixon, a Ginnie Mae account executive, the Petitioner contends that her testimony that a single family loan issuer cannot place manufactured home loans into a Ginnie Mae single family pool was false in light of another government witness's statement to the FBI that manufactured home loans could be placed into Ginnie Mae single family pools. That same individual, however, told the FBI that such homes could be placed in a Ginnie Mae pool only if they were permanent. The Petitioner has, again, shown only that two people may have made inconsistent statements; he has not shown that Dixon testified falsely.

Finally with respect to Brown's testimony, the Petitioner's allegation of perjury rests on alleged inconsistencies between Brown's testimony on direct and his testimony on cross-examination. To the extent such inconsistencies existed, they arose during Brown's testimony. Assuming that Brown did testify falsely on direct examination, the Petitioner has not shown any evidence that the prosecutor knew that Brown was testifying falsely. Moreover, because these statements were made during Brown's testimony, the jury had the benefit of all his purportedly inconsistent statements when making its

credibility determinations.

Other claims of perjurious testimony have been considered and rejected in connection with the Petitioner's allegations that defense counsel mishandled these matters. The Court has also considered but rejected the Petitioner's claim that his counsel mishandled the prosecutor's alleged misrepresentation of Brown's testimony.

The Petitioner next contends that the prosecutor failed to "bring forth" FBMC's application to issue HUD-backed Title I manufactured housing loans and the approval letter. In Brady, the Supreme Court held that the prosecution deprives a criminal defendant of due process when it suppresses evidence that is "favorable to an accused ... where the evidence is material either to guilt or to punishment[.]" Brady, 373 U.S. at 87. In order to establish a Brady violation, a petitioner must show that the evidence at issue (1) is favorable to him, whether directly exculpatory or of impeachment value; (2) was suppressed by the Government; and (3) is material. Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999). In order to show "materiality," a petitioner must show that "there was a reasonable probability" that the result of his trial would have been different if the evidence had been disclosed. Id., at 280.

For the Government to suppress evidence, it must first exist. Dixon

testified at trial that she reviewed FBMC's file prior to her testimony and it contained no application to be a Ginnie Mae manufactured home loan issuer.

Moreover the Petitioner has failed to show that the documents were material to his defense. Whether FBMC was conditionally authorized to issue manufactured home mortgage loans for Ginnie Mae or fund construction loans through BB&T is not relevant to the issue of whether the Petitioner and his co-defendants were authorized to engage in the practices at issue in the trial. The evidence at trial showed that the Petitioner and his co-defendants created, sold and pooled loans made to straw borrowers and for which there were no actual homes provided as collateral. Therefore, the loans that were pooled as Ginnie Mae securities and the loans that were funded with BB&T warehouse line of credit did not qualify as FHA single-family loans, Title I manufactured housing loans, or construction loans. The notes sold by FBMC were instead simply paper, with no worth, designed to cover the scheme to defraud. Thus, it is immaterial whether the Petitioner or his co-defendants were, in fact, authorized to make, sell or pool legitimate loans because that authorization would not extend to the types of fictitious loans being created and sold or to the conduct of the conspiracy. Since the Petitioner cannot establish a Brady violation, he cannot show that counsel was ineffective in having failed to raise such violation.

Finally, the Petitioner complains that the prosecutor committed misconduct by improperly arguing on appeal that the co-defendants had built only a dozen homes and sold none. According to the Petitioner, about thirty homes were built and at least five of them were sold. James McLean admitted on cross-examination, however, that he only built "about 12 houses," but issued 186 "investor loans." [Criminal Case No. 3:02cr156, Trial Tr. Vol. V, at 132]. Because the prosecutor's representation was supported by the record and was a fair comment on the evidence at trial, the Petitioner cannot establish either prosecutorial misconduct or ineffective assistance of counsel on this basis.

In summary, the Court concludes that the Petitioner's attorney was effective in performance both at trial and on appeal. Because counsel performed effectively, there is no need to reach the prejudice prong of the Strickland test.

The Court has considered the Petitioner's motion, any attached exhibits, and the record of the prior proceedings. The Court finds that the Petitioner is not entitled to relief and therefore the motion must be denied and this action dismissed. The Court further finds that the Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller-El v. Cockrell, 537 U.S. 322, 336-38, 123 S.Ct. 1029, 154

L.Ed.2d 931 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted). As a result, the Court declines to issue a certificate of appealability. Rule 11(a), Rules Governing Section 2255 Proceedings for the United States District Courts.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Petitioner's Motion to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody (Motion Under 28 U.S.C. §2255) [Doc. 1] is hereby **DENIED**.

**IT IS FURTHER ORDERED** that the Government's Motion for Summary Judgment [Doc. 12] is hereby **GRANTED** and this action is hereby **DISMISSED**.

Signed: February 23, 2011

Martin Reidinger
United States District Judge

39